**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00827-001-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Margo Cruz, | |
| Defendant. | |

Defendant Margo Cruz is charged with conspiracy and possession with intent to distribute cocaine. Doc. 1 at 1-2. The cocaine was found in his vehicle after a drug-detecting dog alerted to the vehicle following a traffic stop. Defendant has filed a motion to suppress evidence obtained as a result of the stop. Doc. 39. The motion is fully briefed, and an evidentiary hearing was held on July 12, 2019. The Court will deny the motion.

**I.     Background.**

The facts in this order are based on the briefing by the parties and evidence presented during the hearing, including credibility determinations.

On December 19, 2016, Special Agent Kyle Stalder of the Drug Enforcement Administration ("DEA") was conducting video surveillance of a residence at 5123 East Red Bird Lane in San Tan Valley, Arizona ("the Residence"), by means of a pole camera. The pole camera had been installed after the DEA received information that co-defendant

1    David Gallego-Machado was using the Residence as a "drug and/or drug proceeds storage

2    location." Doc. 44 at 1-2. At approximately 11:01 a.m., Agent Stalder saw a silver Jeep

3    Cherokee registered to Gallego-Machado depart from the residence. Around noon, the

4    Jeep returned, driving in tandem with a white sedan that Agent Stalder thought was either

5    an Infiniti or a Jaguar. The white vehicle had yellow license plates. Agent Stalder could

6    not zoom the camera quickly enough to read the plates, but he had received information

7    that the drug trafficking operation was sending drugs to New Mexico and assumed the

8    yellow plates were New Mexico plates.[1] Court's Livenote Transcript, July 12, 2019 ("Tr.")

9    at 10. The white sedan entered the garage of the Residence and the garage door was closed.

10   After about ten minutes, the garage door opened and the white vehicle pulled out and left

11   the area. *Id.* This sequence of events was captured on the pole camera and was played for

12   the Court during the evidentiary hearing.

13        Anticipating that the vehicle was headed to New Mexico, Agent Stalder contacted

14   Navajo County Sheriff Office ("NCSO") Sergeant William Murray and explained that the

15   DEA was surveilling the Residence and a suspicious vehicle just left. Tr. at 12. Sergeant

16   Murray suggested Agent Stalder contact NCSO Deputy Randall Keith, who was on patrol.

17   Tr. at 12. Deputy Keith is part of the NCSO Traffic Enforcement and Criminal Interdiction

18   Unit. Doc. 44 at 3. Agent Stadler contacted Deputy Keith, relayed the information, and

19   sent him a picture of the white vehicle taken from the pole camera. Tr. 20-21; *see also* Tr.

20   at 40. This communication is not documented in DEA or NCSO reports, but the Court

21   found the testimony of Agent Stalder and Deputy Keith credible on this point.

22        At approximately 3:50 p.m., Deputy Keith initiated a traffic stop of the white Infiniti

23   sedan with New Mexico plates that Defendant was driving east on I-40 in the Holbrook

24   area, heading toward New Mexico. The dashboard camera in Deputy Keith's vehicle was

25   not functioning properly and did not record the traffic stop. *See* Doc. 44 at 3 n.1. Deputy

26   Keith's body camera recorded the encounter once he made the stop. *Id.*

27

28        [1] The Court takes judicial notice that the standard license plates issued by New
     Mexico are yellow. *See* http://www.mvd.newmexico.gov/standard-plates.aspx (last visited
     July 17, 2019).

1    Deputy Keith approached Defendant's car from the passenger side. Doc. 44 at 3.

2    He requested Defendant's license, registration, and proof of insurance, and explained that

3    he stopped Defendant's vehicle because it crossed the fog line on the road and followed

4    another vehicle too closely. *Id*. at 4. He said he would issue Defendant a warning and

5    asked him to step out of the vehicle and follow him to his patrol car. *Id*. Deputy Keith

6    testified that during this interaction Defendant appeared "very tense and jittery" and

7    seemed to be having difficulty swallowing and speaking. *Id*. at 3. & n.2. While Deputy

8    Keith completed the warning and ran the license plate, he asked Defendant questions about

9    his travel. *Id*.; Doc. 39 at 3. Defendant, who lives in New Mexico, said that he drove to

10   Phoenix to attend an Arizona Cardinals game but was unable to obtain tickets from a

11   scalper. Doc. 44 at 4. He also told the Deputy that he has family in Phoenix, but stayed at

12   a Hampton Inn in Glendale. *Id*. Around 3:57 p.m., Sergeant Murray arrived on scene.

13   Docs. 39 at 3, 44 at 4.

14        At approximately 4:00 p.m., Deputy Keith completed the warning. He then

15   informed Defendant that he was part of a team looking for "illegal narcotics, explosives,

16   weapons, identity theft items and large amounts of currency" along the I-40 corridor.

17   Docs. 39 at 3, 44 at 5. He asked Defendant if he was carrying any of these items, and

18   Defendant said no. Docs. 39 at 3, 44 at 5. Deputy Keith asked permission to search

19   Defendant's vehicle, and Defendant said no. Docs. 44 at 5, 39 at 3.

20        At that point, Deputy Keith told Defendant he was going to walk his drug-detection

21   dog, Russell, around the car. Docs. 39 at 3, 44 at 5. Deputy Keith retrieved Russell from

22   his vehicle and the search began at about 4:01 p.m. Doc. 44 at 5. After about 16 seconds,

23   Deputy Keith testified, Russell "alerted" to the car when he "pawed the trunk area near the

24   license plate and remained in the area of the trunk sniffing intently for several seconds."

25   Doc. 44 at 5. Deputy Keith returned Russell to his patrol car, informed Defendant that

26   Russell had alerted to the trunk, and opened the trunk where he discovered four vacuum-

27   packed rectangular packages of a white powdery substance in the spare tire compartment.

28   Doc. 44 at 6. Defendant was arrested and transported to the NCSO office. *Id*. Testing

revealed that the powdery substance was cocaine. *Id*. Defendant was charged with conspiracy to possess with intent to distribute cocaine (Count 1) and possession with intent to distribute cocaine (Count 2). Doc. 1.

Defendant moves to suppress all evidence obtained as a result of the stop. Doc. 39. He makes four arguments: (1) Deputy Keith had no grounds to stop his vehicle; (2) the stop was illegally prolonged by questioning about illegal activity and the dog search; (3) Russell lacked training and was not reliable because of subpar performance in the field; and (4) Russell did not alert to the trunk. *Id*. at 5-6. The Court will address each argument.

## II.      Reasonable Suspicion to Conduct the Traffic Stop.

Temporary detention of individuals during the stop of an automobile by police, even if only for a brief period and a limited purpose, constitutes a seizure under the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Because investigatory traffic stops are akin to on-the-street encounters addressed in *Terry v. Ohio*, 392 U.S. 1 (1968), the same objective standard applies: an officer may conduct an investigatory stop of a vehicle if there is "reasonable suspicion" that a particular person "has committed, is committing, or is about to commit a crime." *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006).

Defendant argues that Deputy Keith lacked reasonable suspicion to stop his vehicle because (1) crossing the fog line is not against the law in Arizona and (2) Deputy Keith used an improper method for determining that Defendant was following too closely in violation of A.R.S. § 28-730. Doc. 39 at 7-11. The government does not respond to the fog-line argument. Doc. 44 at 6-7. Thus, the Court will consider only whether Deputy Keith had reasonable suspicion to stop Defendant for following too closely.

In Arizona, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent and shall have due regard for the speed of the vehicles on, the traffic on, and the condition of the highway." *See* A.R.S. § 28-730. The law grants officers broad discretion to determine whether a vehicle is unreasonably close.

*See United States v. Ayala*, No. CR-16-002727-001, 2016 WL 4719980, at *4 (D. Ariz. Sept. 9, 2016).

Before stopping Defendant's vehicle, Deputy Keith followed him and used a stopwatch to determine that Defendant was driving less than two seconds behind the vehicle in front of him at a speed of approximately 75 m.p.h.  Doc. 44 at 7.  Defendant argues that, using Deputy Keith's timing rule, the minimum distance between vehicles at 75 m.p.h. would be at least 220 feet, which is an excessive following distance to require of motorists.  Doc. 39 at 10.[2]  Defendant asserts that it would be better for police to require a distance of one car length for every 10 m.p.h. of speed.  *Id*.; *see also* Doc. 59 at 3 (citing case law accepting this standard).  Defendant argues that "utilization of a two or three second rule would make nearly everyone using the freeway, especially while driving in heavy traffic, subject to being stopped for the traffic offense of following too closely."  Doc. 39 at 11.

Arizona courts have upheld the two-second rule when evaluating the reasonableness of a traffic stop.  *See*, *e.g.*, *State v. Sweeney*, 227 P.3d 868, 877 (Ariz. Ct. App. 2010) (Brown, J. concurring); *State v. Morando*, No. 2 CA-CR 2012-4035, 2013 WL 3519455, at *2 (Ariz. Ct. App. July 11, 2013); *State v. Rich*, No. 1 CA-CR 08-0293, 2010 WL 682276, at *3 (Ariz. Ct. App. Feb. 25, 2010) (officer testified that two seconds was the minimum following distance considering the perception and reaction times of the ordinary person).  This rule is also recommended by the Arizona and New Mexico Driver's License Manuals.  *See* Exs. 13-14.  In light of this acceptance of the two-second rule, the Court will defer to Deputy Keith's interpretation of the law and his evaluation of Defendant's driving.  *See State v. Paul*, No. 1 CA-CR 16-0262, 2017 WL 2242849, at *2 (Ariz. Ct. App. May 23, 2017) (deferring to the officer's interpretation of unsafe and unreasonable traveling distance).  The fact that there may be other reasonable methods for calculating safe driving

---

[2] A vehicle moving at 75 m.p.h. moves approximately 110 feet per second.  *See Morando*, 2013 WL 3519455 at *2.

- 5 -

distance does not make Deputy's Keith's method unreasonable, particularly when it has been accepted by Arizona courts and Arizona and New Mexico licensing authorities.

Defendant's argument that the two-second rule would implicate too many innocent drivers is unavailing. Defendant cites *Reid v. Georgia*, 448 U.S. 438 (1980), where the Supreme Court found that the following facts, grouped together, were not sufficient to support reasonable suspicion: (1) the defendant had arrived from Fort Lauderdale, which the agent testified is a principal place for origin of cocaine sold elsewhere in the country; (2) the defendant arrived in the early morning, when law enforcement activity is diminished; (3) the defendant and his companion appeared to be trying to conceal the fact that they were traveling together; and (4) they apparently had no luggage other than their shoulder bags. *Id*. at 441. The Supreme Court held that allowing reasonable suspicion on these innocuous facts would implicate too large a group of "presumably innocent travelers." *Id*.

This case is unlike *Reid.* The officers in *Reid* observed otherwise innocent behavior and used it to infer that criminal activity was occurring. The Supreme Court sought to protect against officers inferring criminal conduct from innocent behavior common to a broad segment of the public. In this case, the criminal activity was not inferred from innocent behavior. Arizona law prohibits following at an unsafe distance. A.R.S. § 28-730. Deputy Keith observed that very behavior. He was not inferring criminal behavior from innocent facts, he was observing the very behavior that violated the statute. Defendant does not argue that the statute is invalid or improper, and, for reasons explained above, the Court concludes that Deputy Keith's method of evaluating the following distance was not unreasonable. That many drivers violate the statute does not require officers to stop using a reasonable method to enforce it, and officers have discretion on when to make traffic stops based on such violations. *See Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 603-04 (2008) ("There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."); *Prouse*, 440 U.S. at 653-54.

Defendant cites three district court cases interpreting A.R.S. § 28-730. Docs. 39 at 9, 59 at 4. In *Ayala*, an officer stopped a vehicle traveling three car lengths behind a leading vehicle, which he testified violated § 28-730 because the driver should have been two seconds behind. 2016 WL 4719980, at \*2. The court studied the officer's dashboard camera video and determined that no objectively reasonable officer could have found that the driver was too close to the vehicle in front of him. *Id*. at \*4. The court also found it significant that the officer observed the vehicle only for two seconds before initiating the traffic stop. *Id*. The *Ayala* court had the benefit of a video of the vehicle before the traffic stop. The Court does not have such a video. And even if it did, the video would be considered only to ensure that Defendant was following less than two seconds behind the leading vehicle, a fact Defendant does not dispute.

The other two district court cases are inapposite. In *United States v. Milan-Zavala*, CR05-01702, 2006 WL at 2033012, at \*4 (D. Ariz. July 17, 2006), the court determined that following 20 feet behind a tractor trailer at 65 m.p.h. was following too closely. As discussed above, the fact that other courts and other officers use different methods to find a vehicle is traveling too closely does not render Deputy Keith's method unreasonable. Defendant also cites *United States v. Terry*, No. CR-16-1350-TUC-CKJ (EJM), 2017 WL 8897148, at \*8 (D. Ariz. Apr. 20, 2017), where the magistrate judge noted that many motorists follow too closely every day without thinking they will be pulled over. The judge's observation, which was used to discredit the driver's testimony that she was following at an appropriate distance, is irrelevant to Deputy Keith's decision. *See Engquist*, 553 U.S. at 603-04; *Prouse*, 440 U.S. at 653-54.

To the extent that Defendant suggests that Deputy Keith pulled the vehicle over for other purposes – a fact the Court does not find – it would not matter. *See* Doc. 59 at 4. Even if a stop is pretextual, it does not violate the Fourth Amendment if it was supported by reasonable suspicion. *Whren*, 517 U.S. 806, 813 (1996).[3]

---

[3] Defendant asks the Court to take judicial notice of a traffic study finding that a majority of rear-end accidents are not caused by following too closely. *Id*. at 10 n.2. This study would seem to question the wisdom of the Arizona statute, an issue beyond the scope

**III.     Reasonable Suspicion to Prolong the Traffic Stop.**

Traffic stops generally can last only as long as reasonably necessary to carry out the mission of the stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614-16 (2015). That mission includes "determining whether to issue a traffic ticket" and "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615.

The Supreme Court has made clear that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). But officers may "perform unrelated investigations that prolong a stop [if] they have 'independent reasonable suspicion justifying the prolongation.'" *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017) (quoting *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015)).

"Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Evans*, 786 F.3d at 788 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in *Montero-Camargo*)). In determining whether an officer had a particularized and objective basis for reasonably suspecting a person of criminal activity, "the totality of the circumstances – the whole picture – must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). This assessment involves the "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." *Id.* at 418. The assessment of the whole picture "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.*

The government does not dispute that the traffic stop in this case was prolonged when Deputy Keith completed the warning and then asked questions about illegal activity and conducted the dog search. Doc. 44 at 9. The question is whether there was reasonable

---

of this case. As noted, Defendant does not claim that A.R.S. § 28 730 is invalid.

- 8 -

suspicion to prolong the stop. The government does not argue that Deputy Keith's observations alone gave rise to reasonable suspicion, but that prolonging the stop was justified by all of the information known to all of the officers involved in Defendant's investigation. Doc. 44 at 9. The government relies on the "collective knowledge doctrine" to aggregate the facts known to the DEA and Deputy Keith.

### A. Collective Knowledge Doctrine.

The collective knowledge doctrine

> allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest. It generally applies in two situations. The first is where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned. The second occurs where an officer with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion directs or requests that another officer conduct a stop, search, or arrest. In both situations, collective knowledge may be imputed only if there has been some communication among the agents.

*United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) (emphasis in original; internal quotation marks and citations omitted); *see also United States v. Ramirez*, 473 F.3d 1026, 1032-33 (9th Cir. 2007).

This case falls within the first situation identified in *Villasenor*. The DEA agents did not direct the NCSO deputies to make or prolong the stop; rather, they shared some of the information they had collected, and Deputy Keith knew additional relevant facts when he decided to prolong the stop. Because there clearly was communication between Agent Stalder and Deputy Keith, including that the DEA was conducting an investigation and had identified a suspicious vehicle, as well transmission of a photo of Defendant's vehicle, the Court finds that the requirement of communication among the officers was satisfied and the collective knowledge doctrine apples.

Defendant argues that the collective knowledge doctrine should not be applied because the "'team' concept is problematic and 'has sparked disagreement.'" Doc. 59 at 9 (citing *Ramirez*, 473 F.3d at 1032). While acknowledging some disagreement in other

courts, the Ninth Circuit has made clear that facts known to involved officers may be aggregated so long as there was some communication between those officers. *Ramirez*, 473 F.3d at 1032. This is a "limited" requirement that does not necessarily require the "conveyance of any actual information among officers." *Id.* at 1032-33. As already noted, the communication requirement clearly is satisfied here.

Further, "[t]he Supreme Court has made clear that an officer's subjective thoughts play no role in the Fourth Amendment analysis." *Id*. at 1030. "[A]n action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018) (emphasis in original; internal quotation marks and brackets omitted). The Court's analysis accordingly will focus on facts viewed objectively, not on any particular officer's state of mind.

### B.    Collective Knowledge Gave Rise to Reasonable Suspicion.

The Court concludes that the officers' combined knowledge provided a sufficient basis for reasonable suspicion to prolong the stop.

#### 1.    The DEA's Tips.

During the hearing, Agent Stalder testified about several events that led the DEA to install a pole camera at the Residence and monitor the activities of co-defendant David Gallego-Machado. In 2016, a confidential DEA source with a proven track record of reliability ("CS1") told the DEA that someone named David was operating a drug stash house in San Tan Valley. Tr. at 6. Later in 2016, the Pinal County Sheriff's Office contacted the DEA with a second confidential source ("CS2") who wanted to provide information on someone named "David" in exchange for leniency in a criminal sentence he was to receive. *Id.* Agent Stalder interviewed CS2, who reported that he had spent two years working for David Gallego at 5123 East Red Bird Lane in San Tan Valley – the Residence – and that David was receiving kilogram quantities of cocaine from Agua Prieta, Mexico. *Id*. CS2 had travelled with David to pick up kilo-quantity shipments, and had also travelled with him to deliver drugs proceeds in Douglas, Arizona. *Id.* According to

CS2, the cocaine was stored in a bedroom and garage of the Residence. *Id.* CS2 also stated that David Gallego's girlfriend, Kimberly Nieto, had recently been arrested trying to smuggle drugs into the U.S. for David. *Id.*

Agent Stalder checked law enforcement records and confirmed that a Kimberly Niego had recently been arrested for attempting to smuggle drugs through a port of entry in Arizona. *Id.* Agent Stalder was also able to verify through drivers' license and utility records that David Gallego-Machado lived at the Residence as CS2 claimed. *Id.* at 7. Further, CS2 reported that David drove a black charger, and agents were able to confirm through surveillance of the Resident that David Gallego-Machado drove a black charger.

On November 26, 2016, CS1 told the DEA that a courier was bringing drugs to David from Agua Prieta. *Id.* at 8. Police stopped the suspected vehicle in Casa Grande and discovered 35 pounds of cocaine. *Id.* The next day, police stopped a truck carrying 71 pounds of cocaine, and informed the DEA that the cocaine in the truck had the same markings as the 35 pounds found in the vehicle the previous day. *Id.* Police searched the second driver's cellphone and found a number for "David," and text messages with the address of the Residence linked to the "David" entry. *Id.* Agent Stalder connected the phone number to Gallego-Machado's by matching it to an insurance claim form. *Id.*

Clearly, the DEA had ample reliable information that co-defendant David Gallego-Machado was engaged in significant drug trafficking at the Residence. *See Adams v. Williams*, 407 U.S. 143, 147 (1972) (an informant's tip may carry sufficient "indicia of reliability" to justify a *Terry* stop; court should employ a totality-of-the-circumstances approach that considers the informant's reliability and basis of knowledge); *United States v. Rowland*, 464 F.3d 899, 907-908 (9th Cir. 2006) (in assessing reliability of an informant's tip, courts may consider whether the informant had a proven track record of reliability, whether the informant revealed his or her basis of knowledge, and whether the informant provided detailed, predictive information that was later corroborated by police observation). This was the context in which Defendant appeared with his white sedan.

/ / /

**2.      Defendant's Actions at the Residence.**

Defendant arrived at the Residence on December 19, 2016, following Gallego-Machado's vehicle.  Defendant promptly drove his white sedan into the garage of the Residence, the garage door closed, the door opened ten minutes later, and Defendant departed immediately.  This conduct was consistent with a transfer of drugs to a courier. *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (finding reasonable suspicion where officers knew there was cocaine in the garage, and they observed defendant enter the garage, stay for ten minutes, and drive out).

**3.      Defendant's Car Was From New Mexico.**

Agent Stalder testified that the DEA had received information that drugs were being distributed from the Residence to New Mexico.  Tr. at 11.  When Defendant's vehicle arrived at the Residence in tandem with Gallego-Machada, it bore yellow license plates, consistent with New Mexico.  When it left the Residence, it travelled east on I-40 toward New Mexico.  Deputy Keith confirmed the New Mexico plates and Defendant's residence in New Mexico when he stopped the vehicle.

**4.      Deputy Keith's Observations.**

Deputy Keith testified that Defendant appeared nervous during the traffic stop.  *Id.* at 49.  Although nervousness alone is not enough to justify an officer's detention of a suspect after he has satisfied the purpose of a stop, *see United States v. I.E.V.*, 705 F.3d 430, 438 (9th Cir. 2012), it is "a pertinent factor in determining reasonable suspicion," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  That Defendant was having difficulty swallowing could reasonably be viewed by the deputy as consistent with nervousness.

**5.      Defendant's Phoenix Travel Plans.**

Defendant told Deputy Keith he traveled to Phoenix to attend an Arizona Cardinals game, but did not attend the game because he did not want to pay the price demanded by ticket scalpers.  *Id.* at 81.  Defendant said he had family in town, but then said he stayed at the Glendale Hampton Inn.  *Id.* at 47.  Defendant also said, as seen in the body camera video, that he took a day off work to attend the game.  A reasonable officer could find it

- 12 -

strange that an individual would take a day off work to watch a football game (presumably losing the wages for that day or at least using a vacation day), make an 800-mile round trip to Phoenix, pay the price of a hotel room near the game, and yet miss the game because he did not want to pay a scalper's price for the ticket. Implausible travel plans can support reasonable suspicion. *See United States v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000) (finding travel plans to be "oddly vague" and sufficient to establish reasonable suspicion where the defendant had driven nearly 200 miles to meet a friend but did not know how to get in touch with him); *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007) (observing that "implausible travel plans can form a basis for reasonable suspicion").

### 6. Travel Along I-40.

Traveling alone along a known drug-trafficking corridor supports reasonable suspicion. Interstate-40 has been recognized as a common route for drug traffickers. *United States v. Urban*, No. 2:17-CR-025-D, 2017 WL 3702016, at *8 (N.D. Tex. Aug. 28, 2017) (noting that I-40 is "a well-known drug trafficking corridor.") *United States v. Bryant*, No. 2:11-CR-0026, 2011 WL 4336681, at *2 (N.D. Tex. Sept. 9, 2011) (same).

### 7. Reasonable Suspicion Conclusion.

"Although an officer's reliance on a mere 'hunch' is insufficient to [prolong] a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard[.]" *Arvizu*, 534 U.S. at 273 (citations omitted). Because probable cause exists when the facts show a "fair probability" that criminal activity is afoot, *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (quotation marks and citation omitted), reasonable suspicion requires something less than a fair probability. It requires only specific, articulable facts that support a reasonable suspicion that a person is engaged in unlawful conduct. In considering the facts, the Court may not take a "divide and conquer approach," assigning less weight to any observation or factor that is susceptible to an innocent explanation. *Arvizu*, 534 U.S. at 274. Instead, each factor must be considered from the vantage point of

- 13 -

a reasonable officer in light of all of the surrounding circumstances. *District of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018).

The Court concludes that the totality of facts known collectively to the officers investigating Defendant clearly gave rise to a reasonable suspicion that Defendant was engaged in drug trafficking. The relevant facts include (1) all of the information known to the DEA which demonstrated that David Gallego-Machado and the Residence were involved in substantial drug trafficking (i.e., reports from two reliable confidential sources, one of whom had worked with Gallego-Machado for two years; corroborating information about Gallego-Machado, where he lived and what he drove; corroborating information about his girlfriend's recent arrest for drug smuggling; corroborating information from two large cocaine seizures; and the fact that Gallego-Machado's phone number and address were in the phone of one of the cocaine smugglers); (2) Defendant's arrival at the Residence driving in tandem with Gallego-Machado; (3) Defendant's immediately driving his vehicle into the garage of the Residence, the garage door closing for ten minutes, and Defendant's immediate departure; (4) the DEA's information that Gallego-Machado was trafficking drugs to New Mexico and the fact that Defendant drove a car with New Mexico plates, lived in New Mexico, and was stopped while driving to New Mexico after his brief time in the garage of the Residence; (5) Defendant's travel on I-40, a known drug transportation route; (6) Defendant's visible nervousness when stopped by Deputy Keith; and (7) Defendant's curious explanation of his stay in Phoenix. Taken together, these facts provided reasonable suspicion to prolong the traffic stop by asking additional questions and conducting a dog sniff. *See Arvizu*, 534 U.S. 277-78 (although each factor "alone [was] susceptible of innocent explanation," together "they sufficed to form a particularized and objective basis for . . . stopping the vehicle"); *Rojas-Millan*, 234 F.3d at 470 (finding that a "combination of suspicious factors justified the short continued detention of the vehicle").

Application of the collective knowledge doctrine in this case is similar to its application in *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986), a case relied on by the Ninth Circuit in *Ramirez*, *see* 473 F.3d at 1034-35, which in turn was relied on by the Ninth Circuit in *Villasenor*, *see* 608 F.3d at 476.  In *Sutton*, customs officials near Bowie, Arizona, observed an aircraft and overheard radio communications that led them to believe the aircraft was engaged in drug smuggling and would fly to a remote landing strip known as Bombers Square.  The officials contacted the customs office in Tucson and asked that law enforcement officers be dispatched to Bombers Square.  The Tucson office asked the Pinal County Sherriff's Department to respond to the square.  Deputy Harrington travelled to the square and ultimately stopped the defendant.  In finding the stop lawful, the Ninth Circuit applied the collective knowledge doctrine and aggregated facts known to the customs officials and Deputy Harrington.  As the Court of Appeals explained: "The articulable facts known by Deputy Harrington combined with those known by the Customs officials, reasonably warranted the suspicion that Ortiz's vehicle was involved in a drug drop." 794 F.3d at 1426-27 (citation omitted).  Likewise, the combined knowledge of the DEA and Deputy Keith clearly supported a reasonable suspicion that Defendant was engaged in drug trafficking.  Prolonging the stop briefly did not violate the Fourth Amendment.

**IV.    Reliability of the Drug-Detecting Dog.**

An alert from a drug-detecting dog establishes probable cause for a warrantless search.  *Florida v. Harris*, 568 U.S. 237, 246-47 (2013).  The Supreme Court has provided this guidance for assessing a drug dog's reliability:

> evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert.  If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.

*Id.*

1    Russell was originally certified through a ten-week course with a handler who
2    preceded Deputy Keith. Tr. at 103. In August 2016, about four months before the stop of
3    Defendant, Russell and Deputy Keith were assigned to work together and were certified
4    through a four-week course by Waddell Kennels. They certified again in July 2017, some
5    seven months after the stop. Doc. 44 at 12; Tr. at 97.

6    Ralph Pendergast, the only drug-dog trainer certified in Arizona by both the
7    National Police Canine Association (NPCA) and the National Narcotic Detector Dog
8    Association (NNDDA), testified that he was one of Russell's trainers and that Russell
9    successfully completed his training and did not fail any tests. Tr. at 103-105. Andre
10   Jimenez, Defendant's drug-dog expert, testified that the four-week handler course was
11   inadequate to train Russell on narcotics detection. *Id*. at 119-120. The Court finds Mr.
12   Pendergast credible.

13   Defendant notes that the NPCA recommends a minimum of 16 hours of dog training
14   per month and that Russell "did not participate in recommended continuous training to
15   maintain adequate performance levels." Doc. 39 at 14-15. Defendants' summary of
16   Russell's training, from records maintained by Deputy Keith, shows that the dog had 10.20
17   hours of training in September 2016, 13 hours in October, 10 hours in November, and 15
18   hours in December. Ex. 43. Deputy Keith testified that he completed additional training
19   during these months but failed to record it. Tr. at 64. Many of the recorded training hours
20   also fail to indicate training results. *See* Ex. 8 at 2-4, 7, 9-10, 12-14, 16, 19. Defendant
21   further argues that Russell's unreliability is reflected in the fact that Deputy Keith found
22   drugs or drug paraphernalia in only half of the instances where Russell alerted according to
23   Deputy Keith's deployment records. Doc. at 15. Deputy Keith testified that Russell had
24   been deployed on other occasions, but he did not record the deployments. Tr. at 87.
25   Russell's true field performance rate is therefore unknown.

26   In *Harris*, the Supreme Court stated that a court can presume a drug-dog is reliable
27   if a bona fide organization has certified the dog after testing his reliability in a controlled
28   setting, but that this presumption is subject to conflicting evidence. 568 U.S. at 246-47.

Defendant does not question the bona fides of the organization that certified Russell in August 2016 and July 2017 – before and after the dog search in this case. Defendant's argument is based in part on Mr. Jimenez's testimony that Russell's original training was inadequate, but the Court finds this evidence outweighed by the fact that Russell was certified by a bona fide organization immediately after that training and a year later.[4]

Defendant also relies on the fact that Russell's 48.2 hours of recorded training time in the four months before Defendant's stop fell 15.8 hours short of the recommended 16 hours of monthly training. But NPCA's recommendation of 16 hours per month is just that – a recommendation – and Deputy Keith testified that he actually engaged in more training than was recorded. Mr. Pendergast, who was Russell's trainer and clearly is qualified in drug-detection dog training, also testified that Russell was a reliable drug dog.

Finally, Defendant argues that Russell had too many false positives to be reliable, but the inadequate records in this case make the error rate impossible to calculate. Deputy Russell's record-keeping clearly was insufficient, but the Court cannot conclude that this proves Russell's unreliability when he was certified through testing in a controlled setting, by a bona fide organization, both before and after the dog search in this case.[5]

The Court concludes that evidence is sufficient to establish Russell's reliability.

## V.     Whether Russell Alerted at the Trunk.

"[C]ircumstances surrounding a particular alert may undermine the case for probable cause – if, say, the officer cued the dog (consciously or not), or if the team was working

[4] The evidence also shows that the location of Russell's training, Waddell Kennels, is associated with the NPCA and the NNDDA. Ex. 10; Tr. at 101. Waddell Kennels and its partners have extensive experience training police dogs and organizing certification programs. Tr. 100-102. Although Defendant takes issue with the manner in which Russell was trained, there is nothing in the description of the certification process, nor in the NPCA standards used, that leads the Court to conclude that the dog was not certified by a bona fide dog certification organization.

[5] The Supreme Court in *Harris* also made clear that records of a dog's field performance are not the best evidence of the dog's reliability because it is not possible to truly capture the number of false-negative and false-positive identifications made by the dog. 568 U.S. at 245. If a dog does not alert and the officer never conducts a search, there is no way of knowing if the failure to alert was a false negative. *Id*. And a false-positive alert could simply mean that drugs in the vehicle were well hidden or that the vehicle contained a residual odor of drugs. *Id*.

under unfamiliar conditions." *Harris*, 568 U.S. at 247-48. Defendant asserts that the video from Deputy Keith's body camera shows that the dog did not clearly alert to Defendant's vehicle. Doc. 39 at 15.

From Sergeant Murray's dashboard camera video and Deputy Keith's body camera video presented at trial (and which the Court has reviewed multiple times in preparing this order), the following is clear. Deputy Keith brought Russell out of the car and the dog relieved himself on the side of the road when instructed to "take a break." Exs. 2, 3. Deputy Keith initiated the drug sniff by walking Russell from front to back on the passenger side of Defendant's car. Russell briefly jumped at the passenger window but continued walking. At the trunk, Russell's behavior changed. He stopped despite the fact that Deputy Keith continued around the back of the car and turned to walk up the driver's side. He turned from walking alongside the car to facing the car, sniffed repeatedly at the right side of the trunk, became excited, looked at Deputy Keith, and wagged his tail. On the body camera video (Ex. 2) at 16:02:33, Russell can be seen raising up and a distinct thump on the trunk is heard, although the camera angle is too high to see Russell's feet. Mr. Pendergast, who trained Russell and testified that he has seen thousands of dog alerts, testified that he trained Russell to scratch once when he alerts, that Russell alerted at the trunk, and that Pendergast heard the scratch of the trunk in Deputy Keith's body camera video. Tr. at 105. On the dashboard video from Sergeant Murray's vehicle, Russell's scratch can be seen. It occurs at 43 second on the short form of the video (Ex. 3), and is visible as Russell raises his right front foot to touch Defendant's car. Deputy Keith then returned Russell to his patrol vehicle and informed Defendant that the dog had alerted.

The parties disagree on whether Russell's behavior at the trunk constituted an alert. The parties' experts presented two different views of what constitutes an "active" or "aggressive" alert. Mr. Pendergast testified that he trained Russell to scratch only one time, which is the industry standard. Tr. at 110-111. Mr. Jimenez testified that an alert must be something more purposeful – a dog should scratch multiple times or demonstrate a

"digging" motion – but he provided no support for this assertion other than his own opinion. Tr. at 116-117.

In *Thomas*, the Ninth Circuit was faced with a similar argument. The defendant argued that "because the dog never completed his trained indication – the sitting discussed earlier – his behavior was an insufficient basis for searching the toolbox." 726 F.3d at 1097. The defendant argued that the alert behavior in that case "consist[ed] of 'untrained' responses that a dog might exhibit at any time, which fall short of probable cause as a matter of law." *Id.* at 1098. The Ninth Circuit disagreed and provided this response:

> Faced with a similar argument, our sister circuit declined to adopt a rule "which would require the dog to give a final indication before probable cause is established." *United States v. Parada*, 577 F.3d 1275, 1281-82 (10th Cir. 2009); *see also id*. at 1275 (upholding as sufficient, the dog's "rapid deep breathing, body stiffening, and upbreaking from the search pattern . . . around a vehicle"). Its rationale was on the mark: probable cause is measured in reasonable expectations, not certainties. . . . Evidence from a trained and reliable handler about alert behavior he recognized in his dog can be the basis for probable cause. Whether a particular dog displays enough signaling behavior will depend on the facts and circumstances of each case.

*Id*.

In this case, Deputy Keith testified credibly that Russell alerted to the trunk, and the video record supports his testimony, as explained above. In addition, Russell's trainer credibly confirmed that Russell was trained to alert with a single scratch, which occurred in this case, and also testified that Russell's behavior, as shown on the videos, constituted a drug alert. Although Defense expert Jimenez clearly has a different view of what constitutes a drug alert, he did not train Russell and *Thomas* rejects the notion that courts must bring a checklist approach to evaluation of a drug-dog alert.

Based on all of the facts, including the testimony of Deputy Keith and Mr. Pendergast and the two video exhibits, the Court finds that Russell alerted to Defendant's trunk. As a result, Deputy Keith had probable cause to search Defendant's vehicle. The search did not violate the Fourth Amendment.

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 39) is **denied.**

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 3/1/2019.

Dated this 18th day of July, 2019.

David G. Campbell
Senior United States District Judge