**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00827-001-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Margo Cruz, | |
| Defendant. | |

Defendant Margo Cruz is charged with conspiracy and possession with intent to distribute cocaine. Doc. 1 at 1-2. Four kilograms of cocaine were found in his vehicle after a drug-detecting dog alerted to the vehicle following a traffic stop. Defendant filed a motion to suppress evidence obtained as a result of the stop, which the Court denied. *See* Docs. 39, 79. Defendant now asserts a second motion to suppress, focused on evidence obtained from a pole camera used to surveil the house of his co-defendant. Doc. 91. The motion is fully briefed, and no party has requested oral argument. Docs. 97, 100. The Court will deny the motion.

**I.   Background.**

The facts in this order are based on the briefing by the parties and evidence presented during the hearing on Defendant's first motion to suppress. *See* Doc. 79.

On December 19, 2016, Special Agent Kyle Stalder of the Drug Enforcement Administration ("DEA") was conducting video surveillance of a residence at 5123 East

Red Bird Lane in San Tan Valley, Arizona ("the Residence"), by means of a pole camera. The pole camera had been installed after the DEA received information that co-defendant David Gallego-Machado was using the Residence as a "drug and/or drug proceeds storage location." Doc. 44 at 1-2. The pole camera was located about 25 feet in the air on a power pole, approximately 75 yards from the Residence, across a vacant lot, and focused on the front of the house, including the driveway and garage. The Residence had no fence or landscaping that obstructed a full view of the house. *See* Doc. 91-1 at 4.

At approximately 11:01 a.m., Agent Stalder saw a silver Jeep Cherokee registered to Gallego-Machado depart from the residence. Around noon, the Jeep returned, driving in tandem with a white sedan that Agent Stalder thought was either an Infiniti or a Jaguar. The white vehicle had yellow license plates. Agent Stalder could not zoom the camera quickly enough to read the plates, but he had received information that the drug trafficking operation was sending drugs to New Mexico and assumed the yellow plates were New Mexico plates. *See* Court's Livenote Transcript, July 12, 2019 ("Tr.") at 10.[1] The white sedan entered the garage of the Residence and the garage door was closed. After about 11 minutes, the garage door opened and the white vehicle pulled out and left the area. *Id.*

Anticipating that the vehicle was headed to New Mexico, Agent Stalder contacted Navajo County Sheriff Office ("NCSO") Sergeant William Murray and explained that the DEA was surveilling the Residence and a suspicious vehicle just left. Tr. at 12. Sergeant Murray suggested Agent Stalder contact NCSO Deputy Randall Keith, who was on patrol. Tr. at 12. Deputy Keith is part of the NCSO Traffic Enforcement and Criminal Interdiction Unit. Doc. 44 at 3. Agent Stadler contacted Deputy Keith, relayed the information, and sent him a picture of the white vehicle taken from the pole camera. Tr. 20-21; *see also* Tr. at 40. This communication is not documented in DEA or NCSO reports, but the Court found the testimony of Agent Stalder and Deputy Keith credible on this point.

---

[1] The Court takes judicial notice that standard license plates issued by New Mexico are yellow. *See* MVD New Mexico, http://www.mvd.newmexico.gov/standard-plates.aspx (last visited Oct. 16, 2019).

At approximately 3:50 p.m., Deputy Keith initiated a traffic stop of the white Infiniti sedan with New Mexico plates that Defendant was driving east on I-40 in the Holbrook area, heading toward New Mexico. After Deputy Keith's drug-detection canine alerted to the trunk of Defendant's vehicle, Deputy Keith searched the trunk and found four vacuum-packed rectangular packages of a white powdery substance in the spare tire compartment. Doc. 44 at 6. *Id*. Testing revealed that the powdery substance was cocaine. *Id*.

Defendant moves to suppress all evidence obtained by use of the pole camera. He argues that the pole camera was installed without a warrant, that he had a reasonable expectation of privacy at the Residence, and that surveillance by the pole camera violated his Fourth Amendment rights. Doc. 91. Because the Court concludes that Defendant had no reasonable expectation of privacy at the Residence, it need not address whether surveillance by the pole camera was otherwise lawful under the Fourth Amendment.[2]

## II. Defendant Lacked a Reasonable Expectation of Privacy.

In *Minnesota v. Carter*, 525 U.S. 83 (1998), a law enforcement officer looked through a gap in the closed blinds of a first-floor apartment and observed a narcotics bagging operation. *Id.* at 85. Officers detained two males in a vehicle after they left the apartment. A search of the vehicle revealed a firearm, pagers, a scale, and cocaine. *Id.* A subsequent search of the apartment revealed cocaine residue and additional plastic baggies. *Id.* at 86. One of three males observed inside the apartment had leased the premises, while the other two had traveled from another state for the purpose of packaging the cocaine. *Id.* The two males filed a motion to suppress the evidence obtained from the apartment and the vehicle, arguing that it constituted the fruit of an unlawful search by the law enforcement officer who looked through the window without a warrant. *Id.*

The Supreme Court explained that "that in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy

---

[2] Both parties cite cases addressing the warrantless use of pole cameras. Courts in this district have held that such cameras, when focused on public spaces, do not violate the Fourth Amendment. *See United States v. Brooks*, 911 F. Supp. 2d 836, 841-42 (D. Ariz. 2012); *U.S. v. Krawczyk*, 2013 WL 2481275, at *4 (D. Ariz. 2013). The government cites many cases that have reached the same conclusion. *See* Doc. 97 at 11-13.

in the place searched, and that his expectation is reasonable[.]" *Id.* at 88. Although "an overnight guest in a home may claim the protection of the Fourth Amendment, . . . one who is merely present with the consent of the householder may not." *Id.* at 90. The Court reached the following conclusion with respect to the two defendants before it:

> Respondents here were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours. There is no suggestion that they had a previous relationship with Thompson [the fellow who leased the apartment], or that there was any other purpose to their visit. Nor was there anything similar to the overnight guest relationship in [*Minnesota v. Olson*, 495 U.S. 91 (1990)] to suggest a degree of acceptance into the household. While the apartment was a dwelling place for Thompson, it was for these respondents simply a place to do business.

525 U.S. at 90 (footnote omitted).

The Court held that due to "the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder," the defendants had no reasonable expectation of privacy in the apartment and could not assert a Fourth Amendment violation. *Id.* at 91.

*Carter*'s holding applies here. The pole camera was focused on the Residence of the co-defendant, not on property owned or occupied by Defendant. Defendant visited the Residence for the sole purpose of engaging in a commercial drug transaction. As the government notes without dispute from Defendant, the co-defendant's fingerprints were found on the cocaine packages located in Defendant's trunk, showing that the packages were obtained from the co-defendant. Doc. 97 at 6 n.3. Defendant visited the Residence only briefly – for 11 minutes according to the time shown on the pole camera film. And Defendant provides no evidence that he had any previous connection with the co-defendant or the Residence. Thus, like the defendants in *Carter*, Defendant lacked any reasonable expectation of privacy in the Residence and cannot assert a Fourth Amendment violation based on surveillance of the Residence.

This decision is reinforced by the Ninth Circuit's decision in the *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015). *Lyall* held that plaintiffs who were attending a musical event in a warehouse could not assert a Fourth Amendment violation based on a warrantless search of the warehouse and its occupants. 807 F.3d at 1187-88. The plaintiffs had no ownership in or control of the warehouse, and thus could not assert a trespassory violation as in *United States v. Jones*, 565 U.S. 400 (2012). *Id.* And as mere temporary guests on the property, they had no reasonable expectation of privacy:

> [T]hey have no grounds on which to claim a reasonable expectation of privacy in the warehouse. They happened to be inside the warehouse when the police entered, but that fact, without more, is insufficient to confer Fourth Amendment standing. *See Rakas* [*v. Illinois*, 439 U.S. 128, 135 (1978)] (holding that the mere fact that a person is "legitimately on premises where a search occurs" is not enough to show that the search infringed the person's expectation of privacy); *United States v. Armenta*, 69 F.3d 304, 309 (9th Cir. 1995) (evidence suggesting, at most, that defendant was legitimately on the premises searched was "insufficient to demonstrate a legitimate expectation of privacy").

*Id.*

Likewise, in this case, the fact that Defendant was briefly at the Residence to conduct a drug transaction with the co-defendant did not give him a reasonable expectation of privacy in the Residence.[3]

Defendant argues that the Court should follow the Ninth Circuit's decision in *United States v. Nerber*, 222 F.3d 597, 604 (9th Cir. 2000), which distinguished *Carter*. But the Court finds this case to be much more like *Carter* than *Nerber*. Like the defendants in *Carter*, Defendant in this case visited the Residence briefly, to conduct a drug transaction, with no apparent prior connection to the co-defendant or the Residence. Furthermore, he was observed by the pole camera for only 11 minutes and while engaged in publicly-visible activities. In *Nerber*, by contrast, the defendants were invited into a hotel room by

---

[3] Defendant argues that the holding in *Carter* has been undercut by the Supreme Court's subsequent decision in *Jones*, 565 U.S. 400, but *Lyall* was decided after *Jones* and, as it explained, is wholly consistent with that decision. *See Lyall*, 807 F.3d at 1185-87. Nor does the Court find that *Carpenter v. United States*, 138 S. Ct. 2206 (2018), a decision on cell site location information, reduces the relevancy of *Carter* and *Lyall*.

- 5 -

informants working for the government and later were left alone in the hotel room without knowledge that they were being recorded by a concealed video camera. 222 F.3d at 599. The Ninth Circuit looked to the degree of the intrusion in determining whether the defendants had a reasonable expectation of privacy. *Id.* at 602-03. It held that although the defendants had no reasonable expectation of privacy while the informants were in the room, they gained such a reasonable expectation once the informants left the room, given the severe nature of the government's intrusion:

> We also agree with the district court, however, that once the informants left the room, defendants' expectation to be free from hidden video surveillance was objectively reasonable. When defendants were left alone, their expectation of privacy increased to the point that the intrusion of a hidden video camera became unacceptable. People feel comfortable saying and doing things alone that they would not say or do in the presence of others. This is clearly true when people are alone in their own home or hotel room, but it is also true to a significant extent when they are in someone else's home or hotel room. Even if one cannot expect total privacy while alone in another person's hotel room (i.e., a maid might enter, someone might peek through a window, or the host might reenter unannounced), this diminished privacy interest does not eliminate society's expectation to be protected from the severe intrusion of having the government monitor private activities through hidden video cameras.

*Id.* at 604.

This case is different. Defendant was not videotaped in a private setting where he thought he was alone. The only video surveillance of Defendant occurred while he was in full public view, arriving at the Residence, entering the garage, and departing. No surveillance occurred while he was in the garage. There simply is no intrusion in this case comparable to *Nerber*.

Because the Court finds that Defendant had no reasonable expectation of privacy at the Residence, Defendant cannot assert a Fourth Amendment violation based on the pole camera's surveillance of the Residence.

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 91) is **denied.**

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 9/4/2019.

Dated this 17th day of October, 2019.

David G. Campbell
Senior United States District Judge